AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia



In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*
635 MEADE DRIVE, SW., LEESBURG, VIRGINIA 20175, WHICH IS A SINGLE FAMILY HOME WITH ATTACHED GARAGE

)
)
)
)
)

Case No.  1:18-SW-292

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Sections 841 and *46 | Conspiracy to distribute heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance |

The application is based on these facts:
See Attached Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

SAUSA David A. Peters

_____
*Applicant's signature*

John M. Mocello, Task Force Officer, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: MAy 24, 2018

/s/ _____
John F. Anderson
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, Virginia

The Honorable John F. Anderson
*Printed name and title*

**ATTACHMENT A**

*Property to be searched*

The premises to be searched is located at **635 Meade Dr. SW, Leesburg, Virginia, 20175**. The property is a single family home with attached garage. The front home is brick with black shutters around the windows. The numbers "635" are affixed horizontally to the top center of the front door entrance to the residence.



**ATTACHMENT B**

*Property to be seized*

1.      Computers or storage media used as a means to commit violations of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute controlled substances), those violations involving Joseph Riley CURRY and occurring after January 1, 2016, including:

    a.   An Apple iPhone 4S, IMEI: 033033008280279, programed to use telephone number (703) 973-7562. It is further requested that any information stored in the memory, including, but not limited to, stored names and telephone numbers (including outgoing and incoming numbers); address book information; stored voicemail, photographs, and text messages; and other stored information reflecting communications regarding illegal activities among and between members and associates involved in drug trafficking activities be seized.

    b.   Any cellular telephones programmed to use phone number (703) 973-7562, and any information stored in the memory, including, but not limited to, stored names and telephone numbers (including outgoing and incoming numbers); address book information; stored voicemail, photographs, and text messages; and other stored information reflecting communications regarding illegal activities among and between members and associates involved in drug trafficking activities.

    c.   Any locked or closed containers believed to contain any of the above listed evidence.

28

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

c.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

d.   evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.   evidence of the times the COMPUTER was used;

29

g. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. records of or information about Internet Protocol addresses used by the COMPUTER;

j. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

31

IN THE UNITED STATES DISTRICT COURT
FOR EASTERN DISTRICT OF VIRGINIA

Alexandria Division



IN THE MATTER OF THE SEARCH OF: 635
MEADE DRIVE, SW., LEESBURG,
VIRGINIA 20175, WHICH IS A SINGLE
FAMILY HOME WITH ATTACHED
GARAGE

Case No. 1:18-SW-292

The Hon. John F. Anderson

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, John M. Mocello, a Task Force Officer (TFO) of the Federal Bureau of Investigation,
being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules
of Criminal Procedure for a warrant to search the premises known as 635 Meade Drive, SW.,
Leesburg, Virginia, 20175 (hereafter **SUBJECT PREMISES**), further described in Attachment
A, for the things described in Attachment B.

2.      I am a detective with the Leesburg Police Department ("LPD"). I have been
employed as a police officer in the Commonwealth of Virginia since 2007. I have been a detective
in the Criminal Investigations Section of LPD since September 2013. Since June 2015, I have
been a TFO with the FBI's Safe Streets Task Force in Manassas, Virginia.

3.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18 of the United States Code.

4.      I have extensive experience investigating violations of federal and state narcotics laws. I have conducted and participated in numerous narcotics investigations resulting in the arrest and conviction of drug distributors, and seizure of quantities of controlled substances. Many of these investigations have involved the distribution and use of cocaine, cocaine base (commonly known as crack cocaine), methamphetamine, and heroin. I have received extensive training in drug identification, drug distribution methods, and drug enforcement techniques from both state and federal agencies. As a result, I am familiar with the use, effects, distribution techniques, appearance, and method of manufacture of controlled substances, including cocaine, crack cocaine, methamphetamine, and heroin.

5.      I have participated in the execution of numerous search warrants and have sworn to numerous affidavits in support of arrest warrants and search warrants for illegal narcotics, paraphernalia related to the use of illegal narcotics, monies or proceeds derived from the sale of narcotics, electronic devices used in furtherance of the sale of illegal narcotics, and records, ledgers and documents pertaining to the purchase and sale of controlled substances.

6.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, observations of other law enforcement officers and agents involved in this investigation, and information provided by known sources of information. All

2

observations referenced below that I did not personally make were related to me by the persons who made such observations.

7.      I submit that there is probable cause to believe that Joseph Riley Curry (CURRY) engaged in a conspiracy to distribute controlled substances, including heroin, a Schedule I controlled substance, and fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841 and 846. I further submit that there is probable cause to believe that a cellular telephone with assigned call number (703) 973-7562 is and contains evidence of CURRY's involvement in this conspiracy. I further submit that there is probable cause to believe that this cellular telephone will be found within the **SUBJECT PREMISES**.

8.      This affidavit contains information necessary to support probable cause for this application. Because this affidavit is being submitted for the limited purpose of establishing probable cause for this application, I have not included every detail known to the government. Rather, I have set forth only those facts that I believe are necessary to establish probable cause.

9.      This affidavit is being submitted in support of a search warrant for the **SUBJECT PREMISES,** further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

10.     In or around October 2016, the Federal Bureau of Investigation (FBI), the Loudoun County Sheriff's Office (LCSO) and LPD detectives began investigating CURRY's involvement in the distribution of heroin and fentanyl in Loudoun County, Virginia, within the Eastern District

3

of Virginia. Investigators interviewed two individuals, cooperating defendant 1 (CD-1)[1] and

cooperating defendant 2 (CD-2)[2], regarding their narcotics dealings with CURRY. Additionally,

law enforcement used a Confidential Source (CS-1)[3] to conduct a controlled purchase with

CURRY, which occurred on May 9, 2016. During that controlled purchase, the CS-1 purchased

---

[1] In 2017, CD-1 pled guilty in the Eastern District of Virginia to a one-count criminal information charging him with obstruction of justice in relation to his narcotics relationship with CURRY. CD-1 is cooperating pursuant to a plea agreement with the government in the hopes of receiving a reduction in his adjudged sentence. CD-1 has been cooperating with law enforcement since March 2016. CD-1 has prior state convictions for drug related offenses. CD-1 provided incomplete information in his initial interactions with law enforcement. However, after voluntarily meeting with law enforcement and in proffering pursuant to the plea agreement, CD-1 has provided information, the completeness and validity of which law enforcement has been able to corroborate. CD-1 chose to stop cooperating with law enforcement based on a state charge, the existence of which pre-dated the initiation of CD-1's cooperation before pleading guilty. For these reasons, I consider CD-1's information to be reliable.

[2] In 2017, CD-2 pled guilty in Loudoun County Circuit Court to a felony offense for involuntary manslaughter related to his narcotics relationship with CURRY. CD-2 is cooperating pursuant to a plea agreement with the government in the hopes of receiving a reduction in his adjudged sentence. CD-2 has been cooperating with law enforcement since March 2016. CD-2 has prior state convictions for drug related offenses. The information CD-2 initially provided law enforcement was incomplete. However, after voluntarily meeting with law enforcement and in proffering pursuant to the plea agreement, CD-2 has provided information, the validity and completeness of which law enforcement has been able to corroborate. For these reasons, I consider CD-2's information to be reliable.

[3] CS-1 has been a confidential source since 2016. CS-1 is not facing criminal charges nor is he seeking relief from any sentence of confinement. CS-1 is not cooperating for financial gain. CS-1 voluntarily offered to assist law enforcement in investigating narcotics crimes in Loudoun County. CS-1 is a former heroin customer of CURRY who has been battling addiction. CS-1 has never provided information that law enforcement has found to be false or incomplete. For these reasons, I consider CS-1 reliable.

4

approximately 1 gram of fentanyl, a Schedule II controlled substance, from CURRY for approximately $240.00. The CDs and CS will be referred to in the masculine regardless of their true genders.

## **INTERVIEW OF CD-1**

11.     On March 29, 2016, law enforcement interviewed CD-1 at his residence in Round Hill, Virginia. During the interview, CD-1 admitted to purchasing heroin from CURRY on more than fifteen occasions. CD-1 believed CURRY was a sub-distributor for other dealers. CURRY charged CD-1 approximately $40.00 for approximately 0.15 grams of heroin. CD-1 admitted to purchasing $275.00 worth of heroin from CURRY and an unindicted co-conspirator (UCC-1) on or about March 18, 2016. CD-1 further admitted to providing a portion of that heroin to a friend, E.L., who died on or about March 18, 2016, after ingesting the heroin CD-1 purchased from CURRY and UCC-1. A subsequent toxicological examination of fluids taken from E.L. confirmed the presence of heroin. Following an autopsy, the Office of the Chief Medical Examiner determined that E.L died from accidental heroin poisoning.

12.     Before the March 29, 2016, interview, CD-1 agreed to conduct a controlled purchase with CURRY. CD-1 attempted to arrange this controlled purchases through text messages sent over a cellular telephone.

13.     On April 19, 2016, law enforcement examined text messages on CD-1's cellular telephone with CURRY. CD-1 engaged in these communications at the direction of law enforcement. LPD detectives obtained a Commonwealth of Virginia search warrant on April 19, 2016, for CD-1's cellular telephone. All text messages obtained from the search warrant were at

the direction of LCSO.  The following is an excerpt of the conversation between CURRY and CD-1 on March 23, 2016:

> CURRY: Stop giving attitude [CD-1]
>
> CD-1: What attitude?? Smh
>
> CD-1: Dude what's up with [UCC-1]? Is he ok?
>
> CD-1: Well since [UCC-1] is totally faking on me for some reason can I get something off you?
>
> CD-1: ?????
>
> CURRY: Why are you blowing me up people's phones looking for me dude?
>
> CURRY: I'm not [UCC-1]
>
> CD-1: What? I'm just trying to cop something
>
> CURRY: I'll trade for addies
>
> CD-1: Really I don't have many left but I got cash
>
> CURRY: what do you need
>
> CD-1: What you want for a g?
>
> CURRY: 240
>
> CD-1: Damn that's steep…  Well someone just hit me back that's available now so ima grab something small to get me by tonight but I can meet up with you tomorrow like for sure?  I know you got the good shit lol

14.    Based on my training and experience, and knowledge of the case, I believe CD-1 and CURRY were arranging a transaction for approximately 1 gram of heroin for $240.00 after

6

CD-1 could not reach UCC-1.  I further believe that CD-1 believed that CURRY would provide powerful heroin.

15.    The following is an excerpt of the conversation between CD-1 and CURRY from March 26, 2016:

CURRY: I've got some of that really good shit

CURRY: Heard [UCC-1] blocked you lol

CURRY: So hmu if u want some

CD-1: Wtf why he block me?  I'm broke right now but thanks for the heads up

CURRY: Because he said you were blowing him up, being rude as fuck and disrespectful. Said you didn't have any patience and you would like harass him if he didn't come and serve you immediately.

16.    Based on my training and experience, and knowledge of the case, I believe UCC-1 informed CURRY that he would no longer deal with CD-1.  In response, I believe CURRY offered to provide CD-1 heroin.

17.    The following is an excerpt of the conversation between CD-1 and CURRY from March 28, 2016:

CURRY: Do u want anything

CURRY: I have that everybody overdosing type shit

18.    Based on my training and experience, and knowledge of the case, CURRY offered to sell CD-1 heroin that was powerful enough to cause an overdose.

19.    The following is an excerpt of the conversation between CD-1 and CURRY from April 4, 2016:

7

CURRY: Hey

CURRY: I got dope

CURRY: GOOD dope.  Way better shit than you've ever gotten from me before

CURRY: [CD-1]

CURRY: Do u want anything

CURRY: Are you getting my texts?

20.    Based on my training and experience, and knowledge of the case, I believe CURRY was, again, offering to sell CD-1 strong heroin.

## INTERVIEW WITH CD-2

21.    On or about March 1, 2016, law enforcement interviewed CD-2 in Leesburg, Virginia.  CD-2 told LPD Detectives he had purchased heroin from CURRY between February 29, 2016 and March 1, 2016.  CD-2 later admitted to providing a portion of the substance he obtained from CURRY to a friend, J.C., who died on or about March 1, 2016, after ingesting that substance.  A subsequent toxicological examination of fluids taken from J.C. confirmed the presence of fentanyl.  The Office of the Chief Medical Examiner determined that J.C. died from accidental fentanyl, morphine, and ethanol poisoning.

22.    CD-2 admitted that he provided CURRY $100.00 for approximately 0.4 grams of suspected heroin. Before the purchase, CD-2 used a portion of the substance he obtained from CURRY at CURRY's residence in Leesburg, Virginia, (believed to be the **SUBJECT PREMISES**) and lost consciousness.  CD-2 did so at CURRY's direction.  CD-2 admitted that when he regained consciousness, he was on the outdoor steps leading to CURRY's basement. CD-2 believes that after he lost consciousness, CURRY dragged him from the residence and placed

8

him outside. Investigators photographed injuries, including scrapes to CD-2's back and legs, that appear to have resulted from being dragged over concrete.

23.     Once CD-2 awoke, CD-2 left CURRY's residence and provided the substance he purchased from CURRY to friends, including J.C.

24.     Law enforcement learned CD-2 arranged the heroin transaction with CURRY using Facebook Messenger. On March 8, 2016, law enforcement obtained a Commonwealth of Virginia search warrant for both CD-2's and CURRY's Facebook accounts.  With respect to CURRY's Facebook account, the warrant authorized, *inter alia*, the search and seizure of messages from 5:00 p.m. on February 29, 2016, through 3:00 p.m. on March 1, 2016.  The following is an excerpt of the messages exchanged by CD-2 and CURRY between February 29, 2016 and March 1, 2016:

CD-2: Word. Well I'm trying to see if you know where anything's at?

CD-2: Dude you can preach to me all you want but whatever I get it. Can you find shit? And if so are you willing to help me out? No I'm the one who went out to find it and put the needle in my arm.

CD-2: I'm looking for a gram

CURRY: I dont like people popping up out of the blue that I havent fucked with in years

CURRY: normally in loudoun county when this kinda thing happens it someone getting set up

CURRY: i dont really have a g like that

CURRY: just how much are u tryin

CURRY: to spend

CD-2: I get it I really do. I have been in st Augustine Florida for rehab. I'm tryin to spend

9

$100

CURRY: aight

CURRY: well I cant give u a g for that

CD-2: What can you do?

CURRY: u can come through with that and get .4

CURRY: im in woodlea

CD-2: For 100?

CD-2: The most I'll do for that is 60

CURRY: alrighty

CURRY: lol

CD-2: So 60

CURRY: no

CURRY: just lemme know if u want what I said

CD-2: You really want 100 for .4?

CURRY: yes

CURRY: were not in the city dude

CD-2: Aware

CURRY: im not trying to sell .4 for 60 and not actually profit

CD-2: What about 80?

CURRY: its not some bullshit shitty dope either…and it's on point

CURRY: do u have 0 tolerance right now?

CURRY: if your tolly is at 0 then .4 will give you 4 nice ass shots

10

CURRY: in fact I would prefer to be there with you when you do ur first shot

CURRY: just come on and ill give u something worth your while for 100 dude

CD-2: Alright

CD-2: I'll be there in 10

CURRY: ur not a fucking snitch right

CD-2: Nah dud lol

25.      Based on my training and experience, and knowledge of the case, I believe CD-2 and CURRY were arranging a transaction for approximately 0.4 grams of heroin for $100.00. I further believe that this transaction occurred at the **SUBJECT PRESMISES**. I further believe CURRY established his quoted price in order to make a profit from the sale of this substance. I further believe that CURRY believed his product was strong.

### INTERVIEW OF CS-1 AND CONTROLLED PURCHASE WITH CURRY

26.      In or around April 2016, law enforcement began working with a confidential source (CS-1) who claimed to have purchased heroin from CURRY in the past. CS-1 agreed to conduct a controlled purchase with CURRY.

27.      On May 9, 2016, at law enforcement's direction, CS-1 arranged to purchase approximately 1 gram of heroin from CURRY for approximately $240.00. The CS contacted CURRY over text messages to arrange the purchase. CURRY used a cellular telephone with assigned call number (703) 973-7562 to communicate with CS-1. Law enforcement has screen shots of those communications. The following is an excerpt of the discussion between CS-1 and CURRY beginning on May 8, 2016 and ending on May 9, 2016:

CS: Think you'll be good tomorrow?

11

CURRY: Ya

CS: Could you do something early? Like 11?

CS: ?

CS: What's up man?

CS: I have a limited window tomorrow but would like to get a gram. Let me know if 11am works.

CURRY: Ya ok

CURRY: A gram is gna cost 240 though

CS: Word. No problem. I'll hit you up when I'm headed your way.

28.     Based on my training and experience, and knowledge of the case, I believe CURRY agreed to provide CS-1 with 1 gram of heroin for $240. CS-1 agreed to contact CURRY when he was nearby.

29.     On May 9, 2016, law enforcement met with CS-1 before the transaction. After searching him and his vehicle for contraband (with negative results) law enforcement provided CS-1 with $240.00 to complete the purchase. Law enforcement established surveillance at the suspected location of the deal—the **SUBJECT PREMISES**. On May 9, 2016, CS-1 and CURRY, who was still using the cellular telephone with assigned call number 703-973-7562, exchanged the following text messages:

CS-1: Leaving soon. You up?

CS-1: Yo What's up??

CS-1: You said you could do something at 11. I'm about to leave bro.

CS-1: I don't have much time

12

CS-1: Wake up son!

CS-1: Riley. Come on man

CS-1: Riley!

CS-1: Yo!

CS-1: Hit me up

CS-1: Hit me up as soon as you wake up man.

CURRY: C'mon through

CS-1: Cool.  Gimmie 15

CS-1: Yo. I'm here

CS-1: What's up

CURRY: If you start doing this shit again then you can sit and wait longer its no skin off

my teeth

CS-1: All right bro. Damn.

CS-1: I'm here.  Whenever your ready

CURRY: I'm just waiting for my dad to go downstairs

CS-1: K

CURRY: Just pull right up behind my car

30.     On May 9, 2016, law enforcement observed the transaction between CS-1 and

CURRY.  Specifically, law enforcement witnessed CURRY exit the **SUBJECT PREMISES** and

meet with CS-1 at his vehicle.  Law enforcement watched CS-1 and CURRY conduct a hand-to-

hand transaction, and then observed CURRY return inside the **SUBJECT PREMISES**.  The

transaction was video-recorded.

13

31.     Law enforcement met with CS-1 following the transaction.  CS-1 provided law enforcement the substance he obtained from CURRY and confirmed that the individual who provided the substance was, in fact, CURRY.  Subsequent laboratory testing revealed that the substance obtained during the controlled purchase was approximately 1 gram of fentanyl.

### Target Letter and Jail Calls Regarding CURRY's Cellular Device

32.     In August 2017, the Loudoun County Sherriff's Department arrested CURRY for a state felony drug distribution offense.  Thereafter, CURRY was detained at the Loudoun County Adult Detention Center.  CURRY pleaded guilty to that charge in Loudoun County Circuit Court. On April 30, 2018, that Court sentenced CURRY to five years of incarceration, with three years and four months of that sentence suspended, followed by five years of supervised probation.

33.     On or about August 9, 2017, the United States Attorney's Office for the Eastern District of Virginia served CURRY, via his lawyer, with a letter informing him he was the target of a federal investigation.  That letter informed CURRY he had until September 1, 2017, to contact the United States Attorney's Office if he wished discuss a resolution to his case.

34.     On or about March 28, 2018, the Loudoun County Adult Detention Center provided law enforcement with two discs containing CURRY's recorded jail calls.  Law enforcement obtained these discs pursuant to a subpoena issued by the grand jury sitting in the U.S. District Court for the Eastern District of Virginia.  I have reviewed the calls contained on these discs.

35.     On or about August 30, 2017, CURRY made a recorded call from Loudoun County Adult Detention Center to a woman, believed to be his mother, at telephone number (703) 777-8606. During this call, CURRY and his mother discussed CURRY's cellular telephone. CURRY's mother told CURRY that his father got the telephone's screen fixed. CURRY asked why they were

14

fixing his phone. CURRY's mother explained that they wanted to keep the telephone and the information contained therein because they thought it might be "worth your while" and "it might be better for you." In discussing the communications on the phone, CURRY's mother explained, "We are not talking hundreds of thousands of dollars of stuff you know, you're pretty small-time." CURRY agreed that his mother should keep the phone.

36.    Based on my training, experience, and knowledge of this investigation, I believe CURRY's mother decided to keep CURRY's cellular telephone because she believed the information contained therein would show he was not a high-level drug dealer. I further believe that she did so with CURRY's consent.

37.    Later in that same recorded telephone call, CURRY's mother stated that CURRY's father would be "following up with that lawyer today" and remarked that "September 1st is the day after tomorrow[.]" CURRY responded saying the lawyer still "had time[.]" CURRY's mother then said that if CURRY spoke to his lawyer to let her know because she "want[s] to find out what's going on because I'm just as in the dark as you are[.]"

38.    Based on my training, experience, and knowledge of this investigation, I believe CURRY's mother was referencing the September 1, 2017, deadline to contact the United States Attorney's Office, as set in the August 9, 2017, target letter. Furthermore, based on the foregoing, I believe that the full context of the recorded jail call on August 30, 2017, shows that CURRY's mother decided to keep CURRY's cellular telephone because CURRY was a target of a federal investigation. The United States Attorney's Office for the Eastern District of Virginia has not yet charged CURRY in connection with its ongoing investigation of his drug-trafficking activities. Therefore, I believe that CURRY's mother is still in possession of CURRY's cellular telephone.

15

**CONNECTION BETWEEN (703) 777-8606 AND THE SUBJECT PREMISES**

39.     On May 21, 2018, Verizon responded to an administrative subpoena requesting subscriber information for telephone number (703) 777-8606 for the period of January 1, 2016, through May 14, 2018.  In its response, Verizon indicated that this number is a landline subscribed to "Phil Curry" at 635 Meade Drive SW, Leesburg, Virginia 20175 (the **SUBJECT PREMISES**). Based on my knowledge of this investigation, I believe "Phil Curry" is CURRY's father. Therefore, I further believe that in the recorded calls referenced above, CURRY called his mother at the telephone associated with the **SUBJECT PREMISES**. Based on the forgoing, I believe that CURRY's parents are maintaining possession of CURRY's cellular telephone at the **SUBJECT PREMISES**.

**INFORMATION REGARDING CURRY'S CELLULAR TELEPHONE WITH ASSIGNED CALL NUMBER (703) 973-7562**

40.     On April 4, 2016, AT&T responded to an administrative subpoena requesting subscriber information and call-records for the cellular telephone with assigned call number (703) 973-7562, suspected to be used by CURRY. Based on that response, law enforcement learned that the cellular telephone was subscribed to CURRY and associated with the same address as the **SUBJECT PREMISES**.  Further, the call-records showed that the device using that account was an Apple iPhone 4S.

41.     On April 27, 2016, AT&T also provided information showing that International Mobile Equipment Number (IMEI) for the cellular telephone with call number (703) 973-7562 was 013033008280279. An open source query on that IMEI showed that it is likely assigned to an Apple iPhone 4S.

16

42.     On May 11, 2018, AT&T responded to an additional administrative subpoena requesting subscriber information for (703) 973-7562 for the period from April 11, 2017, to May 7, 2018. The results showed the number was last subscribed to CURRY and was active between March 1, 2014, and November 23, 2017.

## TECHNICAL TERMS

43.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  IP Address: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

17

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

44.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the **SUBJECT PREMISES**, in whatever form they are

found.  One form in which the records might be found is data stored on a computer's hard drive

or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B).

45.     *Probable cause.*  I submit that if a computer or storage medium is found on the

**SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that

computer or storage medium, for at least the following reasons:

   a.  Based on my knowledge, training, and experience, I know that computer files or

       remnants of such files can be recovered months or even years after they have been

       downloaded onto a storage medium, deleted, or viewed via the Internet.

       Electronic files downloaded to a storage medium can be stored for years at little

       or no cost.  Even when files have been deleted, they can be recovered months or

       years later using forensic tools.  This is so because when a person "deletes" a file

       on a computer, the data contained in the file does not actually disappear; rather,

       that data remains on the storage medium until it is overwritten by new data.

   b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or

       slack space—that is, in space on the storage medium that is not currently being

18

used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

46.   *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

19

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and

20

malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic

21

and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

47. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large

23

volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

48.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

24

49.     Because several people share the **SUBJECT PREMISES** as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

50.     Based on the information provided in this affidavit, I submit that probable cause exists to believe that JOSEPH RILEY CURRY and others did unlawfully, knowingly, and intentionally conspire to distribute heroin and fentanyl, Schedule I and II controlled substances, respectively, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.  Moreover, there is probable cause to believe evidence of this offense is contained on CURRY's cellular telephone with assigned call number (703) 973-7562.  Finally, there is probable cause to believe that that cellular telephone is currently located at the **SUBJECT PREMISES**.  Wherefore, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, I respectfully request a warrant to search and authority to seize at the **SUBJECT PREMISES** those items identified in Attachment B.

John M. Mocello
Task Force Officer
Federal Bureau of Investigation


Subscribed and sworn to before me this 24th the day of May, 2018.

/s/
John F. Anderson
United States Magistrate Judge
The Honorable John F. Anderson
United States Magistrate Judge
Eastern District of Virginia

26

## ATTACHMENT A

*Property to be searched*

The premises to be searched is located at **635 Meade Dr. SW, Leesburg, Virginia, 20175**. The property is a single family home with attached garage. The front home is brick with black shutters around the windows. The numbers "635" are affixed horizontally to the top center of the front door entrance to the residence.



## **ATTACHMENT B**

*Property to be seized*

1.      Computers or storage media used as a means to commit violations of Title 21, United States Code, Sections 841 and 846 (conspiracy to distribute controlled substances), those violations involving Joseph Riley CURRY and occurring after January 1, 2016, including:

   a.   An Apple iPhone 4S, IMEI: 033033008280279, programed to use telephone number (703) 973-7562. It is further requested that any information stored in the memory, including, but not limited to, stored names and telephone numbers (including outgoing and incoming numbers); address book information; stored voicemail, photographs, and text messages; and other stored information reflecting communications regarding illegal activities among and between members and associates involved in drug trafficking activities be seized.

   b.   Any cellular telephones programmed to use phone number (703) 973-7562, and any information stored in the memory, including, but not limited to, stored names and telephone numbers (including outgoing and incoming numbers); address book information; stored voicemail, photographs, and text messages; and other stored information reflecting communications regarding illegal activities among and between members and associates involved in drug trafficking activities.

   c.   Any locked or closed containers believed to contain any of the above listed evidence.

28

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    c.  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    d.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    e.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    f.  evidence of the times the COMPUTER was used;

29

g.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.  records of or information about Internet Protocol addresses used by the COMPUTER;

j.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.  contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

31